


# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR M. BRAINSON IRA R/O,<br><br>               Plaintiff,<br><br>     v.<br><br>RYE SELECT BROAD MARKET FUND, LP.,<br>TREMONT PARTNERS, INC., TREMONT GROUP<br>HOLDINGS, INC., RYE INVESTMENT<br>MANAGEMENT, JIM MITCHELL, and ROBERT<br>SCHULMAN,<br><br>               Defendants. | Case No.:<br><br> |

## CLASS ACTION COMPLAINT

Plaintiff, Arthur M. Brainson IRA R/O ("Brainson"), through its attorneys, brings this action on behalf of himself and all others similarly situated, on personal knowledge as to itself and its own acts, and on information and belief as to all other matters based on the investigation conducted by and through counsel, which included the review of complaints filed by the United States Government and the Securities and Exchange Commission (the "SEC"), news reports published in the financial press, and other available information.

## NATURE OF THE ACTION

1.     Brainson is a limited partner in Rye Select Broad Market Fund, L.P. ("Rye Select"), a limited partnership managed by Tremont Partners, Inc. ("Tremont"), which is the general partner of Rye Select.  Plaintiff and other Class (defined below) members are qualified investors that purchased limited partnership interests in Rye Select.

2.     During the Class Period (defined below), Defendants caused and permitted all of the investment capital of Rye Select to be invested with Bernard L. Madoff Investment Securities

LLC ("Madoff Securities"), an investment advisory service founded by Bernard L. Madoff ("Madoff").

3.      On December 11, 2008, Madoff was arrested by federal authorities for operating a $50 billion Ponzi scheme, in which Madoff used the principal investments of new clients to pay the fictitious "returns" of other clients. Madoff and Madoff Securities were charged with securities fraud by the SEC. Madoff and Madoff Securities were also criminally charged with securities fraud by the United States Attorney's Office for the Southern District of New York.

4.      Although Tremont promised "[e]ffective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and … portfolio management," Defendants failed to conduct reasonable due diligence before investing all of Rye Select's assets in Madoff Securities. By investing in Madoff Securities, Defendants ignored many red flags that should have caused them, as investment professionals, to conduct further due diligence and/or alter their investment decisions. These red flags included, among others:

a.      the lack of transparency into Madoff Securities, including Madoff's refusal to disclose his investment strategy;

b.      Madoff Securities' returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

c.      the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

d.      Madoff acted as his own prime broker, while most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

e.    unlike most hedge funds, which charge investment management fees based on the performance of the fund, Madoff Securities only generated revenue through transaction-based commission fess;

f.    monthly account statements sent to Madoff's investors did not support the returns they reported;

g.    in 1999, one of Madoff's competitors, Harry Markopolos, sent a letter to the SEC claiming that "Madoff Securities is the world's largest Ponzi Scheme";

h.    Madoff Securities' auditor, Friehling & Horowitz, consisted of one office in Rockland County, New York, with three employees, one of whom was 78 years old and lived in Florida, and one of whom was a secretary;

i.    regulatory filings of the feeder funds showed very small positions in equities, which the feeder funds explained was due to Madoff's strategy of converting all the assets to cash equivalents at the end of every quarter, but there was no record of the estimated $13 billion in assets being moved all at once; and

j.    Madoff Securities' comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers.

5.    Defendants' representations regarding their oversight, thorough manager research, careful due diligence, risk allocation, and portfolio management were false and misleading, because Defendants either conducted no due diligence, or their due diligence was so negligent and/or reckless that they missed these and other obvious warnings signs.

6.    Had Defendants conducted a due diligence investigation of Madoff and Madoff Securities, or if conducted, a proper one, Plaintiff and the other members of the Class (defined below) would not have invested in Rye Select.

3

7.      As a result of Defendants' wrongful conduct, including the failure to conduct due diligence into the legitimacy of Madoff Securities, Rye Select's investments in Madoff Securities have been wiped out, thereby damaging Plaintiff and the other members of the Class.

8.      Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as for common law fraud, negligent misrepresentation and breach of fiduciary duty under New York State law.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as under the laws of the State of New York.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects have occurred within this District, and at least four of the five Defendants reside in and/or maintain principal executive offices in this District.

11.      In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.      Plaintiff Arthur M. Brainson IRA R/O is a limited partner in Rye Select.  During the Class Period, Brainson invested $1,725,000.00 in Rye Select, as set forth in the certification

4

attached hereto, and continues to own that investment, which is now worthless as a result of Defendants' wrongful conduct.

13.     Defendant Rye Select is a limited partnership organized in May 1994 under the Delaware Revised Uniform Limited Partnership Act. Rye Select's principal office is located at 555 Theodore Fremd Avenue, Rye, New York 10580. During the Class Period, Rye Select allocated its entire investment portfolio to Madoff Securities.

14.     Defendant Tremont is the general partner of Rye Select. Tremont is located at 555 Theodore Fremd Avenue, Rye, New York 10580. As general partner, Tremont is responsible for the management of Rye Select's investment management activities, and has primary responsibility for monitoring the ongoing activities of Rye Select's investment advisors, including Madoff. Tremont is a registered investment adviser, and a wholly-owned subsidiary of Tremont Group Holdings, Inc.

15.     Defendant Tremont Group Holdings, Inc. ("Tremont Group") is a holding company for Tremont Capital Management and Rye Investment Management. Tremont Group is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

16.     Defendant Rye Investment Management is Tremont Group's line of single manager investment products, such as Rye Select. Rye Investment Management is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

17.     Defendant Robert Schulman was president, Chief Executive Officer, and Chairman of the Board of Tremont until 2006, and president and Chief Executive Officer of Rye Investment Management until July 2008. Schulman resides at 1 Fifth Avenue, Apartment 16-J, New York, NY 10003.

18.     Defendant Jim Mitchell is and has been president and Chief Executive Officer of Rye Investment Management since July 2008.

## SUBSTANTIVE ALLEGATIONS

19.     During the Class Period, Rye Select offered participation in its investment partnership to qualified investors through a confidential private placement memorandum (the "Private Placement Memo"). While the Private Placement Memo has been amended or revised from time to time, it has contained similar information relevant to this action.

20.     According to the Private Placement Memo, Rye Select may invest in one or more securities accounts managed by one or more selected investment advisors or managers.

21.     According to the Private Placement Memo, Rye Select allocated its entire investment portfolio to one manager, referred to as the Designated Manager, selected by Tremont. During the Class Period, Rye Select's Designated Manager was Madoff and/or Madoff Securities; the Private Placement memo, as well as other written materials, did not identify Madoff or Madoff Securities by name. According to a December 15, 2008 *Bloomberg* article, Rye Investment Management had $3.1 billion invested with Madoff.

**Defendants Ignored Red Flags Warning That Madoff's Activities Were Illegitimate**

22.     During the Class Period, Madoff operated a massive Ponzi scheme, in which he used the principal investments of his investors, including Rye Select, to pay the fictitious "returns" of other investors. According to a December 19, 2008 *Bloomberg* article, U.S. government regulators investigating Madoff found evidence that the scheme began at least as early as the 1970s.

23.     For years since the inception of Madoff's scheme, there have been myriad warnings meaningful to investment professionals that Madoff and/or Madoff Securities were

perpetrating a fraud on investors. Some of the red flags are discussed in the paragraphs that follow.

24.    In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns of 13.5 to 20 percent, and invested the money entirely with Madoff. As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients. No action was taken against Madoff.

25.    In May 1999, Harry Markopolos, a derivatives expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

26.    In May 2001, the article "Madoff Tops Charts; Skeptics Ask How" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry. In the article, author Michael Ocrant wrote:

a.    "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry. . . . [The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

b.    "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

c.      These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

d.      "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

e.      "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

f.      "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

g.      "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

h.      "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

27.     On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote:

a.       The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade.  Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year.  When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy.  I can't go into it in great detail.'  Nor were the firms that market Madoff's funds forthcoming."

b.       "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone.  Three options strategists for major investment banks told *Barron's* they couldn't understand how Madoff churns out such numbers using this strategy."

c.       "Adding further mystery to Madoff's motives is the fact that he charges no fees for his money management services."

d.       "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy.  But Madoff's investors rave about his performance – even though they don't understand how he does it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told *Barron's*.  'People who have all the trade confirms and statements still can't define it very well.' ...  This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money."

e.       "'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,'' says an investment manger who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

28.     On November 7, 2005, Markopolos submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real.  Markopolos identified 29 red flags that were signs of highly suspicious activity in Madoff Securities, including, among others:

a.      *"why would B[ernie ]M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"* (Emphasis in original.)

b.      "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. ... ***Why the need for such secrecy?*** *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings."* (Emphasis in original.)

c.      *"It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from.  This makes no sense! ... However, BM's performance numbers show only 7 extremely small [monthly] losses during 14 ½ years and these numbers are too good to be true.  The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent!  And BM never had more than a one month losing streak!"* (Emphasis in original.)

d.      *"Madoff does not allow outside performance audits."* (Emphasis in original.)

e.       *"Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."* (Emphasis in original.)

f.       *"Why is Bernie Madoff borrowing money at an average rate of 16.00% per anum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases* [sic] *upon Bernie Madoff's hard work and brains?  Does this make any sense at all? Typically FOF's* [fund of funds] *charge only 1% and 10%, yet BM allows them the extra 10%. Why?  And why do these third parties fail to mention Bernie Madoff in their marketing literature?  After all he's the manager, don't investors have a right to know who's managing their money?"* (Emphasis in original.)

g.       *"BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM.  This allows for 'cleaner financial statements' according to this source.  Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."* (Emphasis in original.)

29.       Markopolos identified Tremont as one of the four largest feeder funds investing in Madoff.

30.       In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a.       Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b.       Madoff's auditor, Friehling & Horowitz, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big 3

accounting firm. Friehling & Horowitz is now under investigation by the district attorney of Rockland County; and

      c.     Aksia discovered the 2005 letter from Markopolos to the SEC described above.

31.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of Madoff Securities that were reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing. The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

32.     In addition to the foregoing, investment advisors, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Parters, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

33.     Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he managed. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets … There's a clear and blatant conflict of interest with a

manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

**Defendants' Violations of Law**

34.     The Private Placement Memo falsely stated that in selecting an investment advisor or manager, Tremont was guided by, among other factors, the manager's "past performance and reputation"; the "size and efficiency of assets managed"; and the "[c]ontinued favorable outlook for the strategy employed."  The Private Placement Memo also stated that Tremont reviews Rye Select's holdings "not less frequently than quarterly to assess, among other things, their investment performance and to determine whether they continue to meet the general investment criteria" set forth in the Private Placement Memo.

35.     These statements were materially false and misleading because, among other things, they conveyed the false impression that Tremont had conducted, and continued to conduct, a thorough investigation of Madoff and Madoff Securities trading operations, assets under management, and the strategy employed by Madoff – the "split-strike conversion" strategy.  This false impression was made more egregious in light of Tremont's representation on its Website that it conducted effective "oversight, thorough manager research, careful due diligence ... risk allocation and ... portfolio management ..."  Tremont either did not perform due diligence, or its due diligence was so lacking as to be reckless, into the past performance and success of Madoff's investment strategy, which performance was not based on actual returns but rather a Ponzi scheme.  Moreover, had Defendants reviewed Rye Select's trading confirmations, they would have discovered that the confirmations did not support the investment strategy purportedly employed by Madoff or the returns that strategy purportedly generated.

36.     These statements were also materially false and misleading because they conveyed the false impression that Rye Select and Tremont maintained a system of internal

controls, which included continued oversight, portfolio management and due diligence of the investment manager, and which were intended to reduce the risk of loss to the limited partners.

37.     The Private Placement Memo also represented that Rye Select "expects to invest in assets with" a manager (*i.e.*, Madoff) "specializing in hedged transactions using equities, options and index options." This statement was materially false and misleading because it conveyed the false impression that Tremont was investing Rye Select's funds with an investment manager who specialized in "hedged transactions using equities, options and index options." Had Tremont conducted due diligence as represented elsewhere in the Private Placement Memo and on its Website, it would have learned of the red flags identified herein relevant to the "split-strike conversion" strategy, and that Madoff did not have such expertise and that his investment strategy was nothing more than a fraud.

38.     Throughout the Class Period, Rye Investment Management would disseminate fund performance updates. As late as December 2008, the performance report showed consistent positive net returns for the first 11 months of 2008, even during the months of September, October, and November, when the stock market has been in a tailspin. In fact, the performance report showed positive year-to-date net returns for the years 1998 through the first eleven months of 2008. These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

39.     In addition to showing the net monthly returns, the December 2008 performance report included a brief discussion of Rye Select and its investment objective. In this regard, the performance report stated that Rye Select's "investment objective is long-term capital growth," and that to "achieve its objective, the Fund entrusts the management of its assets to investment advisors that have conservative investment styles and have demonstrated, over a prolonged

period of time and under all economic and market conditions, their ability to achieve consistent returns. The Fund's portfolio is currently invested in a 'split strike synthetic conversion' options trading strategy."

40.     These statements were materially false and misleading because they falsely implied that Rye Select and Tremont were pursuing Rye Select's investment objective in a prudent manner by employing investment managers having a conservative style, thereby avoiding risky strategies that could not generate consistent returns "over a prolonged period of time and under all economic and market conditions." Additionally, the statement falsely implied that Rye Select and Tremont selected investment advisors only after they performed a thorough due diligence of the advisors' management style and performance results. Instead of performing such due diligence, Rye Select and Tremont had, with no or inadequate due diligence or oversight, abdicated their responsibilities and entrusted the assets of Rye Select to Madoff and Madoff Securities.

41.     Had Defendants conducted due diligence into Madoff and Madoff Securities, they would have discovered at least some of the dozens of red flags identified herein. At the very least, like Aksia, Defendants should have been able to discover the existence of Markopolos' letter, which would put them on notice of the 29 red flags identified therein.

42.     Tremont, as the general partner of Rye Select (and Schulman as Tremont's Chief Executive Officer), failed to supervise and monitor Rye Select's investments in violation of its fiduciary duties under the laws of both New York and Delaware, and contrary to the representations made in, among other reports, the Private Placement Memo.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who

invested in limited partnership interests of Rye Select between December 22, 2003 through and including December 22, 2008 for claims arising under the Exchange Act (the "Exchange Act Class Period"), and between May 10, 1994 through and including December 22, 2008 for claims arising under state law (collectively, the "Class Period") and who retained their investment through that date (the "Class"). In addition, the Class, with respect to Plaintiff's claims of breach of fiduciary duty only, includes all Rye Select limited partners as of the end of the Class Period. Excluded from the Class are Defendants, members of the immediate family of Defendants Schulman and Mitchell, any affiliate of Rye Select, Tremont, Tremont Group, and Rye Investment Management, and the executive officers of Rye Select, Tremont, Tremont Group, and Rye Investment Management, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

44.     This action is properly maintainable as a class action because:

a.     the members of the proposed Class in this action are dispersed geographically and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the hundreds;

b.     Plaintiff's claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of the federal securities laws and New York law as alleged herein;

c.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

d.      A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein because joinder of all members is

impracticable.  Furthermore, because the damages suffered by individual members of the Class

may be relatively small, the expense and burden of individual litigation make it virtually

impossible for Class members to redress the wrongs done to them.  The likelihood of individual

Class members prosecuting separate claims is remote;

e.      Plaintiff anticipates no unusual difficulties in the management of this

action as a class action; and

f.      the questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class.  Among the questions

of law and fact common to the Class are:

i.      whether Defendants' acts and/or omissions as alleged herein
violated the federal securities laws;

ii.      whether the Defendants' Class Period representations to Plaintiff
and the other Class members misrepresented and/or omitted material facts;

iii.      whether Defendants acted with knowledge or with reckless
disregard for the truth in misrepresenting and/or omitting material facts;

iv.      whether Defendants' conduct alleged herein was intentional,
reckless, or grossly negligent or in violation of fiduciary duties owed Plaintiff and other Class
members and therefore violated the statutory and common law of New York;

v.      to what extent the members of the Class have sustained damages
and the proper measure of damages.

## COUNT I
### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 of the Securities and Exchange Commission
### (Against All Defendants)

45.      Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

46.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

47.    During the Exchange Act Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase limited partnership investment interests in Rye Select.

48.    During the Exchange Act Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly or recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff and the other Class members as particularized above.

49.    In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff and the other members of the Class relied, to their detriment, on such misleading statements and omissions in purchasing limited partnerships in Rye Select.  Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

50.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices,

schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class in connection with their acquisitions of limited partnership interests in Rye Select.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
#### (Against Schulman and Mitchell)

51.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.    Defendants Schulman and Mitchell acted as controlling persons of Rye Select within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of Rye Select's operations, and/or intimate knowledge of Rye Select's products, sales, accounting, plans and implementation thereof, Schulman and Mitchell had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Rye Select, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Defendants Schulman and Mitchell had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.    Defendants Schulman and Mitchell had direct and supervisory involvement in the day-to-day operations of Rye Select and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

54.    By virtue of their positions as controlling persons, Defendants Schulman and Mitchell are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate

result of the wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their acquisitions of limited partnership interests in Rye Select.

## COUNT III
### For Violation of Common Law Fraud
### (Against All Defendants)

55.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.    Plaintiff and other members of the Class in reasonable and justifiable reliance upon the statements and representations made by Defendants, as previously set forth herein, purchased limited partnership investment interests in Rye Select.  Plaintiff and other members of the Class would not have purchased their limited partnership investment interests in Rye Select except for their reliance upon the representations made by Defendants in the Private Placement Memo and performance reports and would never have purchased them had they been aware that Defendants failed to conduct due diligence, or if conducted, failed to conduct an adequate due diligence, of Madoff and Madoff Securities.

57.    At the time the statements and representations were made by Defendants in the Private Placement Memo and performance reports, Defendants knew them to be false and intended to deceive Plaintiff and other members of the Class by making such statements and representations.

58.    At the time of the false statements, misrepresentations and omissions, set forth above, each of the Defendants intended that Plaintiff and other members of the Class would act on the basis of the misrepresentations and omissions contained in the Private Placement Memo and performance reports in determining whether to purchase limited partnership interests in Rye Select.  Plaintiff and other Class members reasonably relied theron to their detriment in making such decisions.

20

59.    Had Plaintiff and other members of the Class known of the material facts that the Defendants wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, Plaintiff and other Class members would not have purchased their limited partnership investment interests in Rye Select.

60.    Plaintiff and other members of the Class, as a result of their purchase of limited partnership investment interests in Rye Select and by reason of Defendants' wrongful concealments and misrepresentations, have sustained damages, losing all or substantially all of their respective investments in Rye Select in an amount yet to be determined, and to be proven at trial.

61.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and other Class members.

62.    Defendants' fraudulent acts were willful and wanton and Plaintiff and other Class members are entitled to punitive damages.

## COUNT IV
### Negligent Misrepresentation
### <u>(Against All Defendants)</u>

63.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.    Defendants owed to Plaintiff and other Class members a duty: (a) to act with reasonable care in preparing and disseminating the Private Placement Memo and performance reports, which were relied upon by Plaintiff and other Class members in deciding to purchase their limited partnership investment interests in Rye Select; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Private Placement Memo and performance reports.

65.     Defendants breached their duties to Plaintiff and other Class members by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Private Placement Memo and performance report, and other representations.

66.     As a direct, foreseeable and proximate result of Defendants' negligence in performing their duties, Plaintiff and other Class members have sustained damages, losing all or a substantial part of their respective investments in Rye Select in an amount yet to be determined, and to be proven at trial.

67.     By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and other Class members.

## COUNT V
### For Breach of Fiduciary Duty
#### (Against Tremont)

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     Defendant Tremont has breached its fiduciary duties to Plaintiff and other Class members.

70.     As a result of its conduct as General Partner with respect to the management of the assets of Rye Select for the benefit of its limited partners, as alleged herein, Tremont has failed to fulfill its fiduciary duty owed to Plaintiff and other members of the Class by acting in bad faith, with gross negligence and in utter disregard for due care and reasonable and prudent investment standards.

71.     As a proximate result of Tremont's bad faith breach of fiduciary duty, Plaintiff and other Class members have sustained damages, losing all or substantially all of their respective investments in Rye Select in an amount yet to be determined, and to be proven at trial.

72.     By reason of the foregoing, Defendant Tremont is liable to Plaintiff and other limited partners of Rye Select who continue to own their interests in Rye Select.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.      Determining that this action to be a proper class action and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Exchange Act, common law fraud, negligent misrepresentation and breach of fiduciary duty under the laws of New York State, in an amount to be proven at trial, including interest thereon;

3.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.      Such other and further relief as is just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

BERNSTEIN LIEBHARD LLP

Dated:  December 23, 2008

By: _____
Stanley D. Bernstein
Sandy Liebhard
Jeffrey M. Haber
Jeffrey Lerner
10 East 40th Street
22nd Floor
New York, New York 10016
Telephone:  (212) 779-1414
Facsimile:  (212) 779-3218

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ARTHUR M. BRAINSON IRA R/O ("Plaintiff"), declares the following as to the claims asserted under the federal securities laws:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint.  Plaintiff retains Bernstein Liebhard LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group.  A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.      Plaintiff's transaction(s) with **RYE SELECT BROAD MARKET FUND**, which is the subject of this action, during the alleged class periods are as follows:

| DATE | INVESTMENTS |
|------|-------------|
| November 1998 | $700,000 |
| April 1999 | $100,000 |
| August 2002 | $450,000 |
| May 2008 | $475,000 |

5.      During the three years prior to the date of this Certification, Plaintiff has not served as a representative party for a class in any action filed under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 2 day of December, 2008.

_Arthur W. Brainson c/o Arthur M. Brainson IRA R/O_
Signature
Arthur M. Brainson c/o Arthur M. Brainson IRA R/O

_Arthur M. Brainson c/o Arthur M. Brainson IRA M_
Print Name

_3 + W 2B K. Tchenir Road_
Address

_New Rochelle, NY 10804_
City, State, Zip

_(914) 255 3842_
Phone Number

_Domarturo @ Aol.com_
Email Address