UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TREMONT SECURITIES LAW, STATE LAW, AND INSURANCE LITIGATION | 08 Civ. 11117 (TPG)<br><br>**ECF FILED** |
| This document relates to:  Securities Actions 08 Civ. 11212 (TPG) | **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF KPMG LLP'S MOTION TO DISMISS
THE COMPLAINT OR ALTERNATIVELY TO COMPEL ARBITRATION
AND TO STAY THE CONSOLIDATED SECURITIES ACTION**

HOWREY LLP
Gary F. Bendinger
(bendingerg@howrey.com)
Gregory G. Ballard
(ballardg@howrey.com)
Corey Worcester
(worcesterc@howrey.com)
Citigroup Center
153 East 53rd Street, 54th Floor
New York, NY 10022
Telephone:  (212) 896-6500
Facsimile:  (212) 896-6501

WILLIAMS & CONNOLLY LLP
John K. Villa (pro hac vice)
(jvilla@wc.com)
David A. Forkner (pro hac vice)
(dforkner@wc.com)
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

**Attorneys for defendant KPMG LLP**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................3

    A.    Bernard Madoff and BMIS ..........................................................................3

    B.    The Tremont Defendants ..............................................................................4

    C.    SEC investigations involving Madoff............................................................5

    D.    KPMG LLP's engagement to audit the
            financial statements of Rye Funds ...............................................................5

    E.    Madoff's confession in December 2008 and the filing of the Complaint...............5

ARGUMENT .......................................................................................................6

POINT I         THE COMPLAINT FAILS TO PLEAD A SECTION 10(B) CLAIM ..................6

    A.    Plaintiffs do not adequately allege scienter ......................................................6

          1.    Allegations of GAAS violations are insufficient .....................................8

          2.    Allegations of "red flags" are insufficient ..................................................9

                  Concentration of investments with Madoff .....................................9

                  Strategy and returns not replicated ...............................................10

                  No third party administrator or custodian......................................11

                  Reliance on performance reports from Madoff ...........................12

                  Discrepancies in trading activity
                  and the open interest in option contracts........................................13

                  Lack of transparency...................................................................13

                  Madoff's later admission of illegal activity ..................................14

                  Madoff's use of small accounting firm .........................................14

          3.    Facts supporting an inference of non-fraudulent intent .............................15

    B.    Plaintiffs do not allege reliance.................................................................17

    C.    Plaintiffs do not allege loss causation .........................................................18

POINT II       THE STATE LAW CAUSES OF ACTION MUST ALSO BE DISMISSED......18

   A.     The Court should decline to exercise supplemental jurisdiction ...........................18

   B.     SLUSA bars the state law claims........................................................................19

   C.     The Martin Act precludes the state law claims....................................................20

   D.     Each of the state law claims is subject to dismissal for failure to state a claim.....21

        1.     Common law fraud ...................................................................................21

        2.     Aiding and abetting breach of fiduciary duty ...........................................22

        3.     Breach of fiduciary duty ..........................................................................22

        4.     Negligent misrepresentation ....................................................................23

POINT III     PLAINTIFFS' CLAIMS ARE SUBJECT TO MANDATORY ARBITRATION AND SHOULD BE STAYED IF THEY ARE NOT DISMISSED ....................23

CONCLUSION................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

AHA Sales, Inc. v. Creative Bath Products, Inc.,
867 N.Y.S.2d 169 (2nd Dep't 2008)................................................................22

AIG Global Securities Lending Corp. v. Banc of America Securities, LLC,
2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005).................................................21

American Bureau of Shipping v. Tencara Shipyard S.P.A.,
170 F.3d 350, 353 (2d Cir. 1999) ...................................................................24

ATSI Communications Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007)..............................................................................3

Aetna Casualty and Surety Co. v. Aniero Concrete Co., Inc.,
404 F.3d 566 (2d Cir. 2005).............................................................................23

Ashcroft v. Iqbal,
No. 07-1015, 2009 WL 1361536 (U.S. May 18, 2009) ....................................6

BHC Interim Funding, L.P. v. Finantra, Inc.,
283 F. Supp. 2d 968 (S.D.N.Y. 2003)..........................................................22, 23

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007)...........................................................................................6

Berk v. Moore, Clayton & Co.,
2006 WL 3616961 (S.D.N.Y. Dec. 11, 2006) ..................................................21

Blue Chip Stamps v. Manor Drug Stores,
421 U.S. 723 (1975).......................................................................................1, 17

CPC International Inc. v. McKesson Corp.,
514 N.E.2d 116 (NY 1987)...............................................................................20

Castellano v. Young & Rubicam, Inc.,
257 F.3d 171 (2d Cir. 2001)..............................................................................21

Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,
183 F. Supp. 2d 559 (E.D.N.Y. 2002) ..............................................................21

DG Liquidation, Inc. v. Anchin, Block & Anchin, LLP,
300 A.D.2d 70 (1st Dep't 2002) .......................................................................22

DSAM Global Value Fund v. Altris Software, Inc.,
288 F.3d 385 (9th Cir. 2002) .............................................................................8

Dean Witter Reynolds, Inc. v. Byrd,
470 U.S. 213 (1985)..........................................................................................24

Dover Ltd. v. A.B. Watley, Inc.,
    423 F. Supp. 2d 303 (S.D.N.Y. 2006)................................................21

Dujardin v. Liberty Media Corp.,
    359 F. Supp. 2d 337 (S.D.N.Y. 2005)................................................21

Dura Pharmaceuticals, Inc. v. Broudo,
    544 U.S. 336 (2005)................................................17

ECA v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009)................................................6

Ernst & Ernst v. Hochfelder,
    425 U.S. 185 (1976)................................................6

Fidel v. Farley,
    392 F.3d 220 (6th Cir. 2004)................................................14

Freschi v. Grand Coal Venture,
    551 F. Supp. 1220 (S.D.N.Y. 1982)................................................18

Friedman v. Anderson,
    803 N.Y.S.2d 514 (1st Dep't 2005)................................................22

Global Minerals and Metals Corp. v. Holme,
    824 N.Y.S.2d 210 (1st Dep't 2006)................................................22

Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)................................................21

Greenblatt v. Richard Potasky Jewelers,
    1994 WL 9754 (S.D.N.Y. Jan. 13, 1994)................................................22

Grippo v. Perazzo,
    357 F.3d 1218 (11th Cir. 2004)................................................20

Hamer v. Chessman,
    129 A.D.2d 491 (1st Dep't 1987)................................................22

Heffernan v. HSBC Bank USA,
    2001 WL 803719 (E.D.N.Y. Mar. 29, 2001)................................................20

Indiana Electric Workers Pension Trust Fund v. Millard,
    2007 WL 2141697 (S.D.N.Y. July 25, 2007)................................................19

In re AOL Time Warner, Inc. Securities & "ERISA" Litigation,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................9

In re Bayou Hedge Fund Litigation,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)................................................16, 20, 21

In re Complete Management Inc. Securities Litigation,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)................................................8

In re Dell Securities Litigation,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)...................................................................10

In re Doral Financial Corp. Securities Litigation,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008)..............................................................8, 15

In re Geopharma, Inc. Securities Litigation,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)....................................................................8

In re New Times Securities Services, Inc.,
    371 F.3d 68 (2d Cir. 2004)...................................................................................20

In re JP Morgan Chase Securities Litigation,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................................8

In re Marsh & McLennan Co., Inc. Securities Litigation,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................................21

In re Mutual Funds Investments Litigation,
    2009 WL 225931 (4th Cir. Jan. 30, 2009)............................................................20

In re One Communications Corp.,
    2009 WL 857535 (S.D.N.Y. March 31, 2009)........................................................8

In re Refco Capital Markets, Ltd. Brokerage Customers Securities Litigation,
    586 F. Supp. 2d 172 (S.D.N.Y. 2008)....................................................................1

In re Salomon Inc. Shareholders' Derivative Litigation,
    1994 WL 533595 (S.D.N.Y. Sept. 30, 1994).......................................................23

In re Warnaco Group, Inc. Securities Litigation,
    388 F. Supp. 2d 307 (S.D.N.Y. 2005)..................................................................22

In re Winstar Communications,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)...........................................................8

Jana Master Fund, Ltd. v. JPMorgan Chase & Co.,
    2008 WL 746540 (Sup. Ct., N.Y. Cty. Mar. 12, 2008) .........................................21

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001)...................................................................................6

Kassover v. UBS AG,
    2008 WL 5331812 (S.D.N.Y. Dec. 19, 2008) ..................................................20, 21

Kaufman v. Cohen,
    307 A.D.2d 113 (1st Dep't 2003) .......................................................................22

Knox v. Agria Corp.,
    2009 WL 185436 (S.D.N.Y. Jan. 27, 2009) ........................................................19

Lander v. Hartford Life & Annuity Insurance Co.,
    251 F.3d 101 (2d Cir. 2001)............................................................................19, 20

Lattanzio v. Deloitte & Touche LLP,
   476 F.3d 147 (2d Cir. 2007)...........................................................................18

Lentell v. Merrill Lynch & Co. Inc.,
   396 F.3d 161 (2d Cir. 2005)...........................................................................18

Lerner v. Fleet Bank, N.A.,
   318 F.3d 113 (2d Cir. 2003)...........................................................................19

Maiden v. Merge Technologies,
   2008 WL 4643538 (E.D. Wis. Oct. 20, 2008) ........................................16

Marcus v. Frome,
   275 F. Supp. 2d 496 (S.D.N.Y. 2003)........................................................21

Marcus v. Frome,
   329 F. Supp. 2d 464 (S.D.N.Y. 2004)........................................................21

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
   547 U.S. 71 (2006)...................................................................................17, 20

Morse v. Weingarten,
   777 F. Supp. 312 (S.D.N.Y. 1991) ............................................................22

Muller-Paisnar v. TIAA,
   2008 WL 3842899 (2d Cir. Aug. 15, 2008)..............................................22

Nanopierce Technologies, Inc. v. Southridge Capital Management LLC,
   2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003)..........................................21

Nappier v. Pricewaterhouse Coopers LLP,
   227 F. Supp. 2d 263 (D.N.J. 2002) ..............................................................9

Novak v. Kasaks,
   216 F.3d 300 (2d Cir. 2000)..............................................6, 10, 12, 13, 14

Pro Bono Investments, Inc. v. Gerry,
   2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005)..........................................21

Reiger v. Price Waterhouse Coopers LLP,
   117 F. Supp. 2d 1003 (S.D. Cal. 2000)........................................................8

Rothman v. Gregor,
   220 F.3d 81 (2d Cir. 2000).............................................................................7

Rush v. Oppenheimer & Co.,
   779 F.2d 885 (2d Cir. 1985) .......................................................................23

SEC v. Pricewaterhouse,
   797 F. Supp. 1217 (S.D.N.Y. 1992)..............................................................7

Sedona Corp. v. Ladenburg Thalmann & Co. Inc.,
   2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ............................................21

Shah v. Meeker,
    435 F.3d 244 (2d Cir. 2006)........................................................................18

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994)..........................................................................8

Spear, Leeds & Kellogg v. Central Life Assur. Co.,
    85 F.3d 21, 26 (2d Cir. 1996) .....................................................................24

Sweater Bee by Banff, Ltd. v. Manhattan Industry, Inc.,
    754 F.2d 457 (2d Cir. 1985) .......................................................................23

Tal v. Superior Vending, LLC,
    20 A.D.3d 520, 521 (2d Dep't 2005) ..........................................................22

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)..............................................................3, 6, 7, 15, 17

Thompson v. Parkchester Apartments Co.,
    670 N.Y.S.2d 858 (1st Dep't 1998) ............................................................21

U.S. Mortgage, Inc. v. Saxton,
    494 F.3d 833 (9th Cir. 2007) ......................................................................20

VTech Holdings Ltd. v. PricewaterhouseCoopers LLP,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) ........................................................22

Vermeer Owners, Inc. v. Guterman,
    585 N.E.2d 377 (NY 1991)..........................................................................20

Wharf (Holdings) Ltd. v. United International Holdings, Inc.,
    532 U.S. 588 (2001)....................................................................................20

Whitehall Tenants Corp. v. Olnick,
    623 N.Y.S.2d 585 (1st Dep't 1995) ............................................................21

Winne v. Equitable Life Assurance Society,
    315 F. Supp. 2d 404 (S.D.N.Y. 2003).........................................................19

Zucker v. Sasaki,
    963 F. Supp. 301 (S.D.N.Y. 1997) ...............................................................7

Zuckerman v. Harnischfeger Corp.,
    591 F. Supp. 112 (S.D.N.Y. 1984) .............................................................17

## Statutes

9 U.S.C. §§ 1, et seq ..........................................................................................24

15 U.S.C. § 77p(b) ............................................................................................19

15 U.S.C. §§ 77p(b) ..........................................................................................19

15 U.S.C. § 78bb(f)(5)(E) ..................................................................................20

15 U.S.C. § 78u-4 ...................................................................................2, 6, 7, 17

28 U.S.C. § 1367(c)(3) .......................................................................................19

28 U.S.C. 1658(b)(1) ..........................................................................................18

Federal Rule of Civil Procedure 9(b) ..............................................................1, 23

Federal Rule of Civil Procedure 12(b)(6) ............................................................1

## Other Authorities

Dan L. Goldwasser et al., Accountants' Liability § 7:1.3 (PLI 2008) ..................23

KPMG LLP submits this memorandum in support of its motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (the "PSLRA") or to stay the claims against KPMG LLP in favor of arbitration.

## PRELIMINARY STATEMENT

Plaintiffs are sophisticated investors that invested in the Rye Select Broad Market Fund (the "Broad Market Fund") and the Rye Select Broad Market Prime Fund (the "Prime Fund") (together, the "Rye Funds").[1] The Rye Funds are hedge funds that invested with Bernard L. Madoff Investment Securities LLC ("BMIS"), a broker-dealer founded by Bernard L. Madoff ("Madoff"). Plaintiffs are among those who lost money in Madoff's criminal Ponzi scheme. In this action, they sue Tremont Partners, Inc. (the general partner of the Rye Funds) and affiliated entities (the "Tremont Defendants"), as well as others. They allege that the Tremont Defendants made many false statements about (1) how the Rye Funds were managed, (2) Madoff's role as an investment adviser, (3) the Rye Funds' objectives and strategies, and (4) due diligence that the Tremont Defendants promised to undertake in selecting managers such as Madoff. (Cmpl. ¶¶ 83-115.) All of these alleged misstatements were made by defendants other than KPMG LLP.

KPMG LLP did not audit the financial statements of Madoff or BMIS and was not obligated to assess, let alone detect, fraud at BMIS. Rather, KPMG LLP audited the financial statements of the Rye Funds. In that role, KPMG LLP issued single-page opinions in March of 2006, 2007, and 2008 stating that its audits complied with Generally Accepted Auditing Standards ("GAAS"). (Cmpl. ¶¶ 37, 193.) While Plaintiffs' losses are unfortunate, the Court should not shift responsibility for their investment decisions to KPMG LLP—which had no professional relationship with Madoff or BMIS—merely because they perceive KPMG LLP to be a deep pocket. Plaintiffs' claims against KPMG LLP should be dismissed with prejudice.

---

[1] Plaintiffs did not invest in the Rye Select Broad Market XL Fund (Cmpl. ¶¶ 8-10, 14-15) and so have no standing to assert claims for investors in that fund. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731 (1975); In re Refco Capital Mkts., Ltd. Brokerage Customers Sec. Litig., 586 F. Supp. 2d 172, 180 (S.D.N.Y. 2008). Plaintiffs assert claims for investors in the Tremont Market Neutral Fund, L.P. (Cmpl. ¶ 10), but do not allege that KPMG LLP audited the financial statements of this fund (Cmpl. ¶¶ 15, 37) or assert claims against KPMG LLP on behalf of such investors. Therefore, this memorandum addresses only the Broad Market Fund and the Prime Fund.

First, the Section 10(b) claim against KPMG LLP must be dismissed for several reasons. Plaintiffs have not alleged facts giving rise to a "strong" inference that KPMG LLP had the required mental state to commit securities fraud, as required by the PSLRA.  15 U.S.C. § 78u-4(b)(2).  Other than conclusory assertions and mere allegations of GAAS violations, which courts routinely hold to be inadequate, Plaintiffs do not even attempt to allege scienter on the part of KPMG LLP.  Indeed, the facts in this case overwhelmingly support an inference that KPMG LLP neither knew of Madoff's fraud nor participated in it.  Madoff was a well-respected financial professional, and BMIS was a registered broker-dealer regulated by the Securities and Exchange Commission (the "SEC").  The fraud perpetrated by Madoff was so well hidden that it eluded numerous prominent financial institutions, hedge funds, and charities that invested with Madoff, as well as the regulators charged with overseeing BMIS.  The SEC's failure to uncover Madoff's fraud in connection with its regular oversight of BMIS or in the course of several investigations provides strong support for an inference that KPMG LLP in auditing the financial statements of the Rye Funds—not Madoff—was similarly in the dark as to Madoff's criminal activities.  In short, the most plausible inference to be drawn in the present circumstances is that in auditing the financial statements of the Rye Funds, KPMG LLP did not know of Madoff's fraud, much less perpetrate it.  The securities fraud claim fails also because Plaintiffs have not adequately pleaded reliance and loss causation.

Second, the state law claims against KPMG LLP must be dismissed for several reasons. Because the federal claim fails, there is no reason to exercise supplemental jurisdiction over state law claims.  Also, the state law claims are barred by the Securities Litigation Uniform Standards Act ("SLUSA"), which prohibits plaintiffs from bringing securities class actions based on state law.  These claims are similarly precluded by the Martin Act, which gives exclusive enforcement power over claims relating to the purchase and sale of securities in New York to the New York Attorney General.  And, Plaintiffs have failed to allege essential elements of each of the claims.

Finally, to the extent that Plaintiffs could assert a valid claim, any such claim would be subject to mandatory arbitration, and the claims against KPMG LLP should be stayed pending arbitration in the event they are not dismissed.

## STATEMENT OF FACTS[2]

Plaintiffs allege that Madoff conducted a long-running, well-concealed, fraud that avoided detection by the SEC, the Tremont Defendants, and many entities and institutions that invested with him.  The Complaint makes clear that KPMG LLP, which audited the Rye Funds' financial statements more than 20 years after the Ponzi scheme began, did not audit the financial statements of Madoff or BMIS.

**A.**   **Bernard Madoff and BMIS**

Madoff was well-regarded in the financial community.  He served as a Chairman of the New York region Board of Governors of the NASD (see Worcester Decl. Ex. 1 at 2), and the SEC appointed him to serve on an advisory committee (see Worcester Decl. Ex. 2 at 3).  BMIS was founded by Madoff in 1960.  BMIS has been registered with the SEC as a broker-dealer since 1960.  Since 2006, it was registered with the SEC as an investment advisor.[3]  The SEC, among other agencies, was responsible for regulating BMIS.

Madoff allegedly began his Ponzi scheme between the early 1980s and the early 1990s. (Cmpl. ¶ 43.)  Whether it was two or three decades, for many years after he began operating a Ponzi scheme, Madoff reported steady gains by purporting to use a trading strategy known as

_____

[2] In deciding a motion to dismiss, the Court may consider documents referenced in the complaint, public disclosure documents, and documents possessed by or known to plaintiffs and upon which plaintiffs relied in bringing suit. See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007); ATSI Commc'ns. Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  All document submitted herewith may be considered on this motion.

[3] BMIS is a brokerage account, not a hedge fund.  Hedge funds are private limited partnerships in which investors become limited partners and own interests in the partnerships.  The hedge funds that invested directly with BMIS are not "feeder funds."  A feeder fund purchases an interest in another hedge fund.  The Rye Funds that invested directly with BMIS did not buy interests in another hedge fund, but rather maintained a brokerage account at BMIS.  A brokerage account customer does not own an interest in the broker.  Rather, a brokerage account operates like a bank account and contains assets that belong to the customer.  (See Worcester Decl. Ex. 3 at 4.)

"split-strike conversion." (Id.)[4]  To conceal his fraud, Madoff made misrepresentations to his clients and "caused to be created and sent to his clients, false trading confirmation and client account statements that reflected bogus transactions and positions." (Cmpl. ¶¶ 44.)  The falsified "trade confirmations and account statements were designed to give the appearance that he had executed his strategy with perfect market timing." (Id.)

## B.    The Tremont Defendants

In 1984, over twenty years after Madoff founded BMIS, Sandra Manske founded Tremont Group Holdings, Inc. ("TGHI"). (Cmpl. ¶ 27.)  TGHI is a holding company for several entities, including Tremont Partners Inc., the general partner of the hedge funds in which the purported class members allegedly invested (id. ¶¶ 18-19), and Tremont Capital Management, which managed the funds in which purported class members allegedly invested (id. ¶¶ 18, 20).

In May 1994, TGHI organized the Broad Market Fund, which began investing with BMIS. (Id. ¶ 54.)  The Tremont Defendants allegedly marketed the fund to investors, including purported class members, "as a gateway to Madoff's investment advisory services, though, for the most part, they did so without disclosing that Madoff was the investment manager of their funds." (Id. ¶ 47.)  The Tremont Defendants allegedly told potential class members that "through use of, among others, [the split-strike conversion strategy], the investment manager (i.e. Madoff) could limit losses when stock prices decline while still affording an upside potential." (Id. ¶ 49.)  Defendant Ernst & Young LLP ("E&Y") was engaged in certain years to audit the financial statements of the Broad Market Fund and did so. (Id. ¶ 38.)

The relationship with BMIS appeared successful, and for many years Madoff appeared to be earning reasonable returns of 8-12% per year for the Broad Market Fund. (Cmpl. ¶ 49.)  In May 1997, the Prime Fund was organized. (Id. ¶ 13.)  The Prime Fund also invested with BMIS,

---

[4] The split-strike conversion strategy reportedly involved:  (1) the purchase of a basket of securities expected to correlate highly with the Standard & Poor's 100 Index, known as the OEX; (2) the simultaneous sale of a call option on the OEX with a notional value similar to that of the equity portfolio; and (3) the simultaneous purchase of a put option on the OEX with a notional value similar to the equity portfolio.  (Cmpl. ¶ 49)

and that relationship also appeared successful. (Id. ¶ 49.) As with the Broad Market Fund, E&Y was engaged to audit the financial statements of the Prime Fund in certain years. (Id. ¶ 38.)[5]

### C.    SEC investigations involving Madoff

In May 1999, Harry Markopolos, a derivatives trader with "experience managing the split-strike conversion strategy," sent a letter to the SEC "describing how Madoff could not have generated the returns he reported." (Cmpl. ¶ 60.) Although the SEC scrutinized Madoff in 1999 and 2000, it did not uncover the Ponzi scheme or make Mr. Markopolos's letter public. In 2004, the SEC's examination staff investigated Madoff to determine whether he was complying with SEC rules concerning execution of customer orders, display of limit orders, and a fraudulent investment practice known as front-running. (Worcester Decl. Ex. 4 at 12-13.) It did not uncover the Ponzi scheme that is at the heart of this litigation.

### D.    KPMG LLP's engagement to audit the financial statements of the Rye Funds

More than a decade after the Tremont Defendants began investing with Madoff, and after the SEC had reviewed the Markopolos letter and investigated Madoff, KPMG LLP was engaged to replace E&Y as the auditor of the financial statements of the Broad Market Fund and the Prime Fund and allegedly issued opinions in March of 2006, 2007, and 2008 on Rye Fund financial statements for fiscal years ended December 31 of 2005, 2006, and 2007, respectively. (Cmpl. ¶ 37; Worcester Decl. Exs. 7-12 each at 3.)

### E.    Madoff's confession in December 2008 and the filing of the Complaint

On December 11, 2008, Madoff's Ponzi scheme was finally revealed, but only after he confessed to federal authorities. Shortly thereafter, more than a dozen overlapping complaints were filed, including this one. Based on a few paragraphs devoted to E&Y and KPMG LLP, lumped together as the "Auditor Defendants" in the Complaint, Plaintiffs purport to assert claims against them for a violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5

---

[5] On July 10, 2001, Oppenheimer Acquisition Corp. acquired Tremont Capital Group Holdings for $145.3 million. (Cmpl. ¶¶ 116, 129.) According to the Complaint, Oppenheimer and its parent, MassMutual, did considerable due diligence on Tremont, but did not uncover Madoff's Ponzi scheme. (Cmpl. 121-128.)

promulgated thereunder by the SEC (Count I), common law fraud (Count III), aiding and abetting a breach of fiduciary duty (Count VIII), negligent misrepresentation (Count X) and breach of fiduciary duty (Count XI).  None of these claims can survive scrutiny.

## ARGUMENT

### POINT I

### THE COMPLAINT FAILS TO PLEAD A SECTION 10(B) CLAIM

The Section 10(b) claim against KPMG LLP fails for at least three independent reasons: Plaintiffs do not adequately allege scienter, reliance, or loss causation.

**A.** **Plaintiffs do not adequately allege scienter**

Under the PSLRA, a Section10(b) plaintiff must plead specific facts giving rise to a "strong inference" that the defendant acted with the required state of mind.  15 U.S.C. §78u-4. The required state of mind is an "intent to deceive, manipulate or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976).  In the Second Circuit, recklessness may suffice, but only if it is so severe that it approximates actual intent.  Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000).[6]  Under no circumstances will negligence suffice.  Hochfelder, 425 U.S. 185.  In the Second Circuit, plaintiffs may attempt to plead scienter by alleging facts showing "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  ECA v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).  Where, as here, the plaintiffs do not plead any cognizable motive to commit fraud, however, they must "raise a strong inference of scienter under the 'strong circumstantial evidence' prong," and "'the strength of the circumstantial allegations must be correspondingly greater.'"  Id. (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).[7]

---

[6] The Supreme Court has reserved the question of whether recklessness might satisfy the scienter requirement.  See Tellabs, 551 US at 319 n.3 (2007); Hochfelder, 425 U.S. at 194 n.12.

[7] Plaintiffs must also satisfy the particularity requirements of with Rule 9(b).  See Novak, 216 F.3d at 306.  Even under Rule 8, Plaintiffs must make "[f]actual allegations" that "raise a right to relief above the speculative level," which means they must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ashcroft v. Iqbal, No. 07-1015, 2009 WL 1361536 (U.S. May 18, 2009).

In deciding whether a complaint gives rise to the required "strong" inference, courts must view the complaint "in its entirety" and assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 US at 323.  Also, courts "must take into account plausible opposing inferences," including "plausible nonculpable explanations for the defendant's conduct." Id.  Ultimately, the inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations," and the complaint may survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." Id. at 324.  Absent such allegations, the Complaint "shall" be dismissed.  15 U.S.C. 78u-4(b)(3)(A).

Significantly, it is particularly difficult to plead scienter against an independent auditing firm.  Plaintiffs must allege that the "accounting practices were so deficient that the audit amounted to no audit at all" or that the audit opinions at issue were such that "no reasonable accountant would have made the same decisions if confronted with the same facts." Zucker v. Sasaki, 963 F. Supp. 301, 307 (S.D.N.Y. 1997); SEC v. Pricewaterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (same).[8]  Plaintiffs must plead facts suggesting that the "accounting practices amount[ed] at best to a pretended audit" or that the "grounds supporting a representation [were] so flimsy as to lead to the conclusion that there was no genuine belief" underlying the statement. Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000).

Additionally, courts have long recognized that it is "economically irrational" to assume an auditor would willingly condone a client's fraud "at the risk of jeopardizing its reputation and license as well as the possibility of damages in an amount much greater than its fee." Zucker, 963 F. Supp. at 308; Pricewaterhouse, 797 F. Supp. at 1242 ("It is highly improbable that an

---

[8] This standard is especially difficult to meet here, where Plaintiffs level their fraud allegations against two of the "Big Four" accounting firms, E&Y and KPMG LLP.  All of the substantive allegations against KPMG LLP are asserted also against E&Y.  (Cmpl. ¶¶ 166-196.)

accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees"). Because "a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud," the allegations establishing scienter must "overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client." Reiger v. PriceWaterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000); DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385 (9th Cir. 2002).

Under these standards, Plaintiffs have not pleaded scienter on the part of KPMG LLP. The Complaint makes few allegations regarding KPMG LLP, and even fewer that relate to KPMG LLP's mental state. (See Cmpl. ¶¶ 166-194.)[9]  They are inadequate as a matter of law.

### 1.  Allegations of GAAS violations are insufficient

Plaintiffs' scienter allegations against KPMG LLP consist almost entirely of allegations that KPMG LLP failed to comply with various requirements of GAAS. Plaintiffs make a series of allegations about what GAAS purportedly requires (Cmpl. ¶¶ 166-180), followed by allegations that KPMG LLP failed to comply with the GAAS requirements (id. ¶¶ 181-191).

The allegations of GAAS violations are not helpful to Plaintiffs. It is well-settled that mere allegations that a company violated Generally Accepted Accounting Principles ("GAAP") or that the company's outside auditors violated GAAS in auditing the company's financial statements are inadequate. See, e.g., In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (standing alone, allegations of a violation of GAAS are insufficient to establish scienter); In re Winstar Commc'ns, 2006 WL 473885, * 11 (S.D.N.Y. Feb. 27, 2006) (same); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) ("It is

---

[9] Conclusory allegations are not enough. See In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 618 (S.D.N.Y. 2005); In re One Commc'ns Corp., 2009 WL 857535, *11 (S.D.N.Y. March 31, 2009). Consequently, allegations that KPMG LLP "recklessly issued unqualified audit opinions on the Lead Plaintiff Funds' financial statements" (Cmpl. ¶¶ 181, 194) do not satisfy pre- or post-PSLRA standards. See, e.g., In re Geopharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 452 n.149 (S.D.N.Y. 2005) (conclusory allegations of recklessness are insufficient); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (that defendants "knew or were reckless in not knowing" certain things does not satisfy the pleading standard for scienter).

unambiguously the law that allegations of a violation of GAAP and GAAS are, without more, insufficient to survive a motion to dismiss").[10]

### 2.   Allegations of "red flags" are insufficient

The remainder of Plaintiffs' scienter allegations against KPMG LLP are contained in paragraph 184 of the Complaint and relate to certain supposed "red flags." (Cmpl. ¶ 184.) None of the allegations rises to the level of a red flag under the case law. See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 240 n.51 (S.D.N.Y. 2004) (red flag must put auditor "on notice that the audited company was engaged in wrongdoing to the detriment of its investors"); Nappier v. Pricewaterhouse Coopers LLP, 227 F. Supp. 2d 263, 278 (D.N.J. 2002) (red flags must be "closer to smoking guns than mere warning signs"). With respect to several of the so-called red flags, there is no allegation that KPMG LLP even knew about the supposed red flag. With respect to all of the so-called red flags, there are compelling circumstances that negate any strong inference of scienter that could be drawn. Indeed, the eight alleged red flags, whether considered individually or as a whole, fail to support a strong inference of scienter.

*Concentration of investments with Madoff.* The first alleged red flag—"that the Lead Plaintiff Funds' investments were heavily concentrated in a single manager, Madoff" (Cmpl. ¶ 184)—is not a red flag. There was nothing suspicious about the Rye Funds' concentration of their assets with a single manager. The private placement memoranda for the Rye Funds disclosed that although it was permissible for the funds' assets to be invested with one or more managers, as a matter of fact, each fund's "portfolio is presently allocated to one Investment

---

[10] Here, the alleged GAAS violations are even less meaningful. Plaintiffs allege that KPMG LLP violated GAAS by not performing audit procedures on BMIS (Cmpl. ¶¶ 176-178, 180-182, 185-190), even though KPMG LLP was not engaged to audit or issue an opinion on the financial statements of BMIS. Given that it is not enough to allege that an auditor did not perform a GAAS-compliant audit on the financial statements of an audit client, then a fortiori it is not enough to allege that an auditor did not perform a GAAS-compliant audit on the financial statements of an entity that was not an audit client. Also, the notion that a firm that is auditing the financial statements of one entity (the Rye Funds) must conduct audit procedures on third parties that are not audit clients and on whose financial statements the audit firm expresses no opinion is utterly novel. No court or other authority has recognized such a principle as a basis for liability under Section 10(b).

Advisor."[11]  The financial statements for the Rye Funds also disclosed, in each year that KPMG

LLP audited them, that the funds were managed by "a single portfolio manager."[12]  Indeed,

Plaintiffs acknowledge in their Complaint that the Rye Funds were "single manager" products.

(Cmpl. ¶¶ 17, 85.)  In these circumstances, where the offering materials and the financial reports

of the Rye Funds represented to investors that the funds were placed with a single manager, it

could not be considered suspicious that the funds were invested as promised.[13]

   *Strategy and returns not replicated.*  The second alleged red flag—"that Madoff's

purported trading strategy and returns were unable to be replicated by others in the financial

industry and were consistently achieved despite the performance of the overall financial market"

(Cmpl. ¶ 184)—is also not a red flag.  There is no allegation that KPMG LLP knew Madoff's

trading strategy and returns could not be replicated.  A red flag must, among other things,

actually come to the attention of, and be known by or obvious to, the auditors during the audit.

See, e.g., Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (requiring "egregious refusal to see

the obvious, or investigate the doubtful"); In re Dell Sec. Litig., 591 F. Supp. 2d 877, 905 (W.D.

Tex. 2008) ("Although the list of risk factors is lengthy, they are not linked to any particularized

facts concerning what PwC knew and disregarded").  Plaintiffs do not allege that efforts of other

financial professionals to replicate Madoff's strategy and returns were known to KPMG LLP.

---

[11] See Worcester Decl. Ex. 13 at 2 (2006 Broad Market Fund private placement memorandum); see also id. at 9, 10;
Worcester Decl. Ex. 14 at ii (2006 Prime Fund private placement memorandum:  "partnership's investment portfolio
is presently allocated to one Investment Advisor"); id. at iii ("This is presently a single investment advisor fund").

[12] See Worcester Decl. Ex. 11 at 7 (Broad Market Fund, 2007); Worcester Decl. Ex. 12 at 7 (Prime Fund, 2007);
Worcester Decl. Ex. 9 at 7 (Broad Market Fund, 2006); Worcester Decl. Ex. 10 at 7 (Prime Fund, 2006); Worcester
Decl. Ex. 7 at 7 (Broad Market Fund, 2005); Worcester Decl. Ex. 8 at 7 (Prime Fund, 2005); Worcester Decl. Ex. 5
at 7 (Broad Market Fund, 2004); Worcester Decl. Ex. 6 at 7 (Prime Fund, 2004).

[13] Plaintiffs assert that they were unaware that it was Madoff who had been selected as the investment adviser for
the Rye Funds (Cmpl. ¶ 87), but that Tremont offered funds managed by Madoff was publicly disclosed in the May
7, 2001 Barrons article (Worcester Decl. Ex. 15 at 2) and the May 2001 MAR/Hedge article (Worcester Decl. Ex. 16
at 2 (specifically mentioning the Broad Market Fund)) that Plaintiffs quote extensively in their Complaint (Cmpl. ¶¶
63-64).  Plaintiffs invested large sums of money in the Rye Funds; the minimum investment was $500,000.
(Worcester Decl. Ex. 13 at 3, Ex. 14 at iv.)  If Plaintiffs wanted confirmation of the name of the "single manager"
who was handling their investments, they could have asked Tremont Partners, Inc. to confirm that it was Madoff.
There is no doubt that Plaintiffs either knew or could have readily learned that the funds were invested with Madoff.

Moreover, as Plaintiffs acknowledge in the Complaint (Cmpl. ¶ 60), Madoff did not disclose the details of the trading strategy that he claimed to use.  In this situation, even if it came to the attention of an auditor that others had attempted to use the strategy without achieving Madoff's reported returns, that fact would not raise concerns.  How could other financial professionals duplicate the strategy if they did not know the important proprietary details about it?  The same can be said for many businesses in which managers employ confidential business practices and techniques to generate returns that outperform competitors.

In any event, Plaintiffs were aware of the returns that were being reported from the financial statements for the Rye Funds and from the account statements and other materials they received regarding their investments.  (Cmpl. ¶ 49; Worcester Decl. Exs. 5-12 (financial statements reporting annual returns).)[14]  Indeed, sophisticated hedge fund investors like Plaintiffs were well-placed to consider and evaluate the returns that Madoff's strategy reportedly generated.  If Plaintiffs questioned the strategy's ability to generate the reported returns, then Plaintiffs could have chosen not to invest or to withdraw their investments.  That Plaintiffs did not do so is clear evidence that there was nothing suspicious on the face of the returns that were being reported.  To the contrary, one of the purposes and objectives of investing in hedge funds rather than more traditional investment products is to pursue attractive investment returns; it should not be viewed as surprising or alarming that some managers of successful funds are able to beat the market's as well as other investment professionals' performance.

*No third party administrator or custodian*.  The third alleged red flag—"that Madoff did not employ any third party administrators and custodians" but "instead ran his own back office operations" (Cmpl. ¶ 184)—is unavailing.  That Madoff served as the investment manager while his broker-dealer, BMIS, acted as custodian for the assets under management was disclosed to

---

[14] Additionally, Madoff's returns were discussed in the May 7, 2001 <u>Barrons</u> and May 2001 <u>MAR/Hedge</u> articles Plaintiffs cite in their Complaint.  (Cmpl. ¶¶ 63-64; Worcester Decl. Ex. 15 at 1 ("compound average annual returns of 15% for more than a decade"); Worcester Decl. Ex. 16 at 2 ("net annual returns roughly in the range of 15%).)

the investors including Plaintiffs.[15]  The financial statements for the Rye Funds specifically stated that the single manager who managed the funds' assets, "through an affiliated registered broker-dealer, also acts as custodian for the Partnership assets it manages." (Worcester Decl. Ex. 5 at 7, Ex. 6 at 7, Ex. 7 at 7, Ex. 8 at 7, Ex. 9 at 7, Ex. 10 at 7, Ex. 11 at 7, Ex. 12 at 7.)

That BMIS performed custodial or back-office functions was not suspicious.  With respect to KPMG LLP's audits of the financial statements of the Rye Funds, BMIS was an independent third party that confirmed that the Rye Funds were not lying to KPMG LLP about their assets (Cmpl. ¶ 44); BMIS was separate from and unaffiliated with the Rye Funds that were KPMG LLP's audit clients.  Moreover, BMIS was a well-established company that had been in business since 1960.  (See Worcester Decl. Ex. 17 at ¶ 1.)  It was a registered broker-dealer, subject to on-going regulation by the SEC.  (Cmpl. ¶ 44 (BMIS filed financial statements with SEC).)  Plaintiffs point to no rule barring a broker-dealer from serving as custodian for customer assets.  In short, absent improper resort to hindsight, it is not reasonable to conclude that BMIS's service as custodian was suspicious, much less a "red flag."  See, e.g., Novak, 216 F.3d at 308.

*Reliance on performance reports from Madoff.*  The fourth alleged red flag—"that the Lead Plaintiff Funds relied solely on Madoff to provide them with reports on the performance of the Funds' investments" (Cmpl. ¶ 184)—is inaccurate and irrelevant.  The Rye Funds used an independent administrator during certain periods.  See supra at 12 n.15.  Also, the Rye Funds' reliance on performance reports from BMIS, a broker-dealer registered with and regulated by the SEC, is unremarkable.  Investors routinely receive and rely on performance reports from SEC-registered broker-dealers.  Consequently, nothing about the Rye Funds' receipt of and reliance on BMIS account statements should have raised concerns.  See, e.g., Novak, 216 F.3d at 308.

---

[15] The Rye Funds employed a third party administrator for at least certain years.  The Broad Market Fund employed The Bank of New York Mellon as sub-administrator beginning in July 2007.  (Worcester Decl. Ex. 11 at 10 (2007 financial statements for the Broad Market Fund); Worcester Decl. Ex. 12 at 10 (2007 financial statements for the Prime Fund).)  The plaintiffs in the Consolidated State Law Action that is related to this Consolidated Securities Action and pending before this Court have in fact sued the Band of New York Mellon based on its service as "fund administrator for one or more of the Rye Funds," as well as SS&C Technologies Holdings, Inc. for its service as "independent asset valuer and or fund administrator for one ore more of the Rye Funds." (Worcester Decl. Ex. 18 (First Consolidated and Amended Class Action and Verified Derivative Complaint, 08 Civ. 11183) at ¶¶ 367, 381.)

*Discrepancies in trading activity and the open interest of option contracts.*  The fifth alleged red flag—"that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts" (Cmpl. ¶ 184)—is debunked by Plaintiffs' admissions that Madoff's reported split-strike conversion strategy was executed only six to eight times a year, that he reportedly exited the markets and put all funds in Treasuries at quarter-end and year-end, and that consequently quarter-end and year-end reports listed only Treasury securities (Cmpl. ¶ 50; Worcester Exs. 5-12 (financial statements reflecting only holdings of Treasury securities at year-end).)  Given that the financial statements on which KPMG LLP conducted its audits reflected only Treasuries, Plaintiffs have no basis for suggesting that in performing audit work on those Treasury positions KPMG LLP should have performed extensive analyses of puts, calls, and option contracts that were not even held at the time.  KPMG LLP's audit opinions state that it audited the financial statements "as of" the "December 31" year-end.  (Worcester Decl. Ex. 5-12.)

Also, Plaintiffs allege elsewhere that Madoff was secretive about his strategy and that he refused to reveal information about his trading.  (Cmpl. ¶ 60.)  Thus, the suggestion that Madoff's purported total trading volume was somehow publicly known is contradicted by Plaintiffs' own allegations in the Complaint.  In any event, Plaintiffs make no allegation that KPMG LLP knew the aggregate volume of all of the trading that Madoff reportedly engaged in for his numerous clients.  Nor could they.  KPMG LLP is alleged only to have audited the Rye Funds, not the hundreds or thousands of other individuals and institutions that invested with Madoff.  Again, alleged circumstances must have been known or at least been "obvious" to the auditor to be considered "red flags" under the law.  See, e.g., Novak, 216 F.3d at 308.

*Lack of transparency.*  There is nothing out of the ordinary about the sixth alleged red flag—"that Madoff lacked transparency and limited access to his books and records" (Cmpl. ¶ 184).  Again, this was disclosed to Plaintiffs.  The private placement memoranda stated that "the General Partner may not always be provided with detailed information regarding all the investments made by the Managers because certain of this information may be considered

proprietary," and further disclosed that "[t]his lack of access to information may make it more difficult for the General Partner . . . to evaluate the Managers." (Worcester Decl. Ex. 13 at 30; Worcester Decl. Ex. 14 at 25.)[16] Nor is it unusual or surprising for investment advisors to withhold information about proprietary trading strategies from the public and competitors.

 *Madoff's later admission of illegal activity.* The seventh alleged red flag—"that Madoff later admitted to illegally manipulating his accounting records" (Cmpl. ¶ 184)—is not a red flag. A red flag is a warning sign in existence at the time of the audit and known to the auditor. See, e.g., Fidel v. Farley, 392 F.3d 220, 229 (6th Cir. 2004) ("red flags" that occurred after audit opinion was issued cannot be a basis for scienter); see also, e.g., Novak, 216 F.3d at 308 (red flag must be "obvious" to the auditor). Madoff did not confess his crimes until December 2008. (Cmpl. ¶ 1.) There can be no allegation that KPMG LLP knew of Madoff's admission during the course of its audits of the Rye Funds' financial statements, which culminated in audit opinions in March of 2006, 2006, and 2008, well before Madoff's December 2008 confession.

 *Madoff's use of small accounting firm.* The eighth alleged red flag—"that BMIS was audited by a small operation, as opposed to 90% of single strategy hedge funds that are audited by one of the top 10 auditors" (Cmpl. ¶ 184)—is also not a red flag. There is no allegation that KPMG LLP knew anything about the firm that audited BMIS's financial statements. KPMG LLP audited the financial statements of the Rye Funds, not BMIS. See, e.g., Novak, 216 F.3d at 308. Moreover, regardless of what the press may be reporting with the benefit of hindsight about the firm that audited BMIS's financial statements, the fact remains that BMIS's financial statements and BMIS's auditors were acceptable to and accepted by the SEC, which regulated BMIS and received those statements. (Cmpl. ¶ 44 (BMIS filed its financial statements with the SEC).) That the SEC accepted BMIS's financial statements, even though audited by a small firm, demonstrates that the mere fact that BMIS was audited by a small firm was not suspicious.

---

[16] The offering materials use the plural "Managers" because, as noted above, the Rye Funds' offering documents permitted the funds' assets to be invested with one or more managers, while disclosing accurately that the funds assets were in fact invested with a single manager. See supra at 10 n.11.

3.     **Facts supporting an inference of non-fraudulent intent**

Thus, Plaintiffs' allegations, even taken in isolation and without considering competing inferences, are inadequate to plead scienter.  Moreover, there are many facts reflected in the Complaint that provide overwhelming support for the inference that KPMG LLP did <u>not</u> act with fraudulent intent.  <u>Tellabs</u> requires that the Court consider "all" of the relevant facts, including "opposing inferences" and "plausible nonculpable explanations."  551 U.S. at 323.

Among the facts that the Court must consider here, which support an inference that KPMG LLP did not know of or participate in Madoff's fraud, are the following:

- Madoff was well-respected.  He served as chairman of the New York region board of NASD and was appointed by the SEC to serve on an advisory committee.  <u>See</u> <u>supra</u> at 3.

- BMIS was registered with and regulated by the SEC.  <u>See</u> <u>supra</u> at 3.

- The SEC, with all of its investigative powers and access to information, failed to uncover Madoff's fraud in connection with its regular oversight of BMIS or in connection with several investigations.  <u>See</u> <u>supra</u> at 5; <u>see also</u> Worcester Decl. Ex. 4 at 11-13.)

- Madoff's fraud was well-hidden from investors.  Madoff's criminal activities eluded the numerous prominent institutions that invested with Madoff, as well as the regulators charged with overseeing his business.  <u>See</u> <u>supra</u> at 5.

- KPMG LLP did not audit the financial statements of Madoff or BMIS and had much less access to information about them than did the SEC and the other public and private institutions and entities that were duped by them.  <u>See</u> <u>supra</u> at 5.

The obvious inference to draw from these facts is that KPMG LLP, in auditing the financial statements of the Rye Funds, did not discover or participate in Madoff's fraudulent activities.

A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314.  Here, where Madoff hid a fraud from regulators, his own clients, and the public, the Court should not draw the unlikely and unreasonable inference that KPMG LLP, which merely audited hedge funds that invested with Madoff, were in on Madoff's fraud.  <u>See</u> <u>In re Doral Fin. Corp. Sec. Litig.</u>, 563 F. Supp. 2d at 466 ("in view of . . . the secretive and manipulative manner in which [the company] accomplished its fraud, it is impossible to draw a

15

strong inference of [its auditor's] scienter from either the length or extent of the fraud, or both, because the competing inference that [auditor] was also tricked . . . is far more compelling"); see also Maiden v. Merge Techs., 2008 WL 4643538, at * 4 (E.D. Wis. Oct. 20, 2008) (The "mere fact that KPMG's audit failed to prevent the ongoing fraud . . . is not enough to establish scienter . . . [Rather], KPMG's competing, more cogent inference of non-fraudulent intent mandates that the amended complaint against KPMG be dismissed").

The decision in In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405 (S.D.N.Y. 2007), is instructive. In that case, Samuel Israel III and Daniel E. Marino allegedly operated a group of hedge funds managed by Bayou Group, LLC as a massive Ponzi scheme. Id. at 407. The plaintiff, an investor named South Cherry Street LLC, sued the investment advisor, Hennessee Group, that had recommended that the plaintiff invest in a Bayou Group hedge fund. In dismissing the securities fraud claim against Hennessee Group, the court explained that circumstances similar to those here strongly supported an inference that the investment adviser did not harbor the required fraudulent intent. The Court wrote, for example, that "[o]ne substantial competing inference this court may draw from these alleged facts is that due diligence would not have uncovered the fraud." Id. at 418. The Court wrote, "[t]he Complaint alleges that Bayou concealed the fraud from investors, the public, investment advisors, other industry professionals and regulators—including the SEC—for nine years." Id. In these circumstances, "[g]iven that Israel and Marino managed to deceive the entire investing community for nearly a decade, South Cherry's allegation that Hennessee Group would necessarily have uncovered the fraud had it conducted the due diligence it promised is far from compelling." Id. Consequently, the court held that "the inference of recklessness alleged by plaintiff—that the Group's failure to uncover the fraud evidences a reckless lack of due diligence—to be less compelling than an opposing inference—that Hennessee Group's failure to discover the fraud merely places it alongside the SEC, the IRS, and every other party that reviewed Bayou's finances." Id.[17]

---

[17] The Bayou court dismissed a securities fraud claim against an investment advisor accused of having affirmatively recommended an investment in the hedge fund that was operated as a Ponzi scheme and of having failed to conduct

Viewing the Complaint as a whole, including competing inferences, <u>Tellabs</u>, 551 U.S. at 322, the most reasonable inference is that KPMG LLP did not know of or participate in Madoff's criminal Ponzi scheme or intend to commit securities fraud.  Plaintiffs have not alleged facts showing a "strong" inference that KPMG LLP acted with the required scienter, and the claim must be dismissed.  15 U.S.C. §§ 78u-4(b)(2) & 78u-4(b)(3)(A).

## B.   <u>Plaintiffs do not allege reliance</u>

Plaintiffs allege that they purchased their interests in the Rye Funds based on statements about how the Rye Funds would be managed and the due diligence that the Tremont Defendants would perform in selecting managers, all of which statements were made by defendants other than KPMG LLP.  (Cmpl. ¶¶ 83-115.)  As Plaintiffs thus acknowledge that they relied on statements of others, not KPMG LLP, in deciding to invest, Plaintiffs cannot establish reliance on KPMG LLP's audit opinion.  See <u>Zuckerman v. Harnischfeger Corp.</u>, 591 F. Supp. 112, 120 (S.D.N.Y. 1984) (reliance is a prerequisite to recovery and plaintiff must show (1) that it believed what defendant said; and (2) that belief caused plaintiff to act).  Furthermore, many members of the proposed class will not be able to establish reliance on any KPMG LLP statement for the additional reason that they purchased their interests in the Rye Funds prior to March 6, 2006, the date of the first alleged statement by KPMG LLP.  (Cmpl. ¶ 37.)  Because "there can be no causal connection where the alleged misrepresentation or omission occurred after the purchase," only purported class members who purchased limited partnership interests after March 6, 2006, may even attempt to recover against KPMG LLP.  <u>Freschi v. Grand Coal Venture</u>, 551 F. Supp. 1220, 1227 (S.D.N.Y. 1982).[18]  This is an additional basis for dismissal.

---

due diligence it had promised to conduct.  The reasoning applies with even more force here, where KPMG LLP did not recommend any investment and is not accused of having failed to conduct promised due diligence.

[18] Plaintiffs may not allege that they "held" their previously acquired interest in reliance on KPMG LLP's statements.  See <u>Blue Chip Stamps</u>, 421 U.S. at 754 (holding that plaintiff was not entitled to sue for violation of Rule 10b-5 where "members of its class are neither 'purchasers' nor 'sellers' as those terms are defined in the 1934 Act"); <u>Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit</u>, 547 U.S. 71, 87 (2006) ("concluding that SLUSA pre-empts state law holder class-action claims" as well).

**C.**     **Plaintiffs do not allege loss causation**

Plaintiffs also fail to plead loss causation.  To plead loss causation, Plaintiffs must show that "the risk that caused the loss was within the zone of risk <u>concealed</u> by the misrepresentations and omissions alleged by a disappointed investor." <u>Lentell v. Merrill Lynch & Co. Inc.</u>, 396 F.3d 161, 173 (2d Cir. 2005); <u>see</u> <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005).  The only alleged misstatement by KPMG LLP is that it conducted its audits "in accordance with GAAS" and expressed an opinion that the Rye Funds' financial statements for the years 2005, 2006, and 2007 present fairly, in all material respects, their financial position.  (Cmpl. ¶ 193.)  It is not possible to place Madoff's perpetration of a secret, decades-long, enormous Ponzi scheme within the "zone of risk" concealed by this alleged misstatement.  KPMG LLP did not audit the financial statements of Madoff or BMIS.  In auditing the Rye Funds it was not within the zone of risk that an independent third party, registered with and regulated by the SEC, would build a giant Ponzi scheme and commit a slew of crimes against hundreds of people and institutions including the audit clients.  Auditors are not charged with responsibility for policing the world. <u>See</u> <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 157 (2d Cir. 2007) ("[I]f [a] 'zone of risk' could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of §10(b) liability would be completely subsumed by the element of misstatement").[19]

---

[19] Plaintiffs' claims are also time-barred.  A Section 10(b) claim must be brought within the earlier of (a) five years of the alleged violation or (b) two years of when Plaintiffs discovered or could have discovered facts on which to base a claim.  28 U.S.C. § 1658(b)(1) and (2).  While claiming they did not have enough information to be on inquiry notice (Cmpl. ¶ 115), Plaintiffs allege that there were public reports of warning signs about Madoff in articles in <u>MarHedge</u> and <u>Barrons</u> in 2001.  (Cmpl. ¶¶ 63-64.)  These articles note that Tremont was among the hedge fund families that funneled investors money to Madoff.  (Worcester Decl. Exs. 15 at 2; 16 at 2.)  Plaintiffs cannot have it both ways.  If these were warning signs, then Plaintiffs were on inquiry notice as of 2001, and their claims are time-barred by the end of 2003.  <u>Shah v. Meeker</u>, 435 F.3d 244, 249 (2d Cir. 2006) ("[i]nformation contained in articles in the financial press may trigger the duty to investigate").  This is also grounds for dismissal.

## POINT II

## THE STATE LAW CAUSES OF ACTION MUST ALSO BE DISMISSED

**A.   The Court should decline to exercise supplemental jurisdiction**

Plaintiffs assert subject matter jurisdiction based on a federal question, not diversity. (Cmpl. ¶ 5.)  With the failure of the federal claim, the Court should follow the routine practice in such cases and decline to exercise supplemental jurisdiction over the state law claims.  See, e.g., 28 U.S.C. § 1367(c)(3); Lerner v. Fleet Bank, N.A., 318 F.3d 113, 130 (2d Cir. 2003).

**B.   SLUSA bars the state law claims**

The state law claims brought by Plaintiffs fail because they are precluded by SLUSA, which vests federal courts with exclusive jurisdiction over most securities class action lawsuits and precludes plaintiffs from filing class actions to vindicate state-law claims.  See id.; Knox v. Agria Corp., 2009 WL 185436, at *1 (S.D.N.Y. Jan. 27, 2009).  Congress enacted SLUSA to close a loophole that permitted plaintiffs to avoid the "stringent procedural hurdles erected by the PSLRA by bringing suit in state rather than federal court."  Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 107–08 (2d Cir. 2001).  The same logic also precludes plaintiffs from dodging the procedural hurdles of the PSLRA by bringing state law claims in federal court.  See 15 U.S.C. § 77p(b) ("No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court") (emphasis added).

SLUSA applies if (1) the lawsuit is a "covered class action;" (2) the claim is based on state law; (3) the claim involves a material misrepresentation or omission; (4) the claim concerns a "covered security;" and (5) the alleged misrepresentation or omission was made "in connection with the purchase or sale" of the security. 15 U.S.C. §§ 77p(b), 78bb(f)(1).  Where these criteria are met, the federal court must dismiss the state law claims.  Indiana Elec. Workers Pension Trust Fund v. Millard, 2007 WL 2141697, at *1 (S.D.N.Y. July 25, 2007); Winne v. Equitable Life Assurance Soc'y, 315 F. Supp. 2d 404, 409 (S.D.N.Y. 2003) (same).

Here, all five requirements are met.  First, the putative class is "covered" under SLUSA because Plaintiffs seek damages on behalf of more than 50 persons.  (Cmpl. ¶ 42.)  Second,

Plaintiffs bring state-law claims against KPMG LLP.  (Cmpl. ¶¶ 207-15, 236-39, 245-49, 250-54.)  Third, the allegations in the Complaint focus on alleged misrepresentations and omissions.  Indeed, they are based on the exact same allegations that give rise to the Section 10(b) claim.  (Cmpl. ¶¶ 207, 236, 245, 250.)  Fourth, Madoff's purported trades in publicly-traded securities constitute "covered securities" for purposes of SLUSA.  See 15 U.S.C. § 78bb(f)(5)(E).[20]  Fifth, the alleged misstatements and omissions were purportedly made "in connection with" covered securities.  (Cmpl. ¶ 202.)  Thus, the state law claims are precluded by SLUSA.[21]

## C.    **The Martin Act precludes the state law claims**

The state law claims against KPMG LLP are also barred by Article 23-A of the New York General Business Law (the "Martin Act").  See, e.g., Kassover v. UBS AG, 2008 WL 5331812, at *7 (S.D.N.Y. Dec. 19, 2008) (dismissing breach of fiduciary duty and negligent misrepresentation claims as preempted by Martin Act); In re Bayou, 534 F. Supp. at 421 (dismissing breach of fiduciary duty claim based on alleged investment advice to invest in hedge fund allegedly operated as a Ponzi scheme as precluded by Martin Act).  There is no private right of action under the Martin Act, CPC Int'l Inc. v. McKesson Corp., 514 N.E.2d 116, 118-119 (NY 1987); Vermeer Owners, Inc. v. Guterman, 585 N.E. 2d 377, 377-378 (NY 1991), and the New York Attorney General has exclusive jurisdiction to enforce the act's prohibition of deceitful practices in the purchase and sale of securities in New York, Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998).

---

[20] See also In re Mutual Funds Invs. Litig., 2009 WL 225931, at *3 (4th Cir. Jan. 30, 2009) (SLUSA applies to plaintiffs who held variable annuities backed by securities); Lander, 251 F.3d at 104; Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 597 (2001) (plaintiff alleged securities fraud where defendant "secretly intending . . . not to honor" sale); U.S. Mortg., Inc. v. Saxton, 494 F.3d 833, 844 (9th Cir. 2007) (rejecting effort to avoid SLUSA by plaintiff who did not "purchase or sell any listed security in response to the misrepresentations"); Grippo v. Perazzo, 357 F.3d 1218, 1224 (11th Cir. 2004) (investor could state a claim for fraud under § 10(b) even though securities were never purchased); Heffernan v. HSBC Bank USA, 2001 WL 803719, at *2-*3 (E.D.N.Y. Mar. 29, 2001) (Ponzi scheme operator's taking of funds to invest in fictitious securities trusts was actionable under § 10(b)); cf. In re New Times Sec. Servs., Inc., 371 F.3d 68, 86-87 (2d Cir. 2004) (investors stated "claim for securities" under Securities Investor Protection Act although securities were "non-existent").

[21] Plaintiffs purport to bring a class action on behalf of "all persons and entities who invested" in the Rye Funds and who "sustained losses thereby."  (Cmpl. ¶ 41.)  To the extent that Plaintiffs attempt to assert "holder" claims, they are also barred.  Dabit, 547 U.S. at 87 ("SLUSA pre-empts state law holder class-action claims").

Because of the exclusive jurisdiction of the Attorney General, who is in fact investigating claims related to Madoff's Ponzi scheme (Cmpl. ¶ 49-50), and the lack of a private right of action under the Martin Act, "courts have <u>routinely</u> dismissed private state law securities claims sounding in fraud or deception that do not require pleading or proof of intent, reasoning that allowing them to proceed would be, in effect, allowing private causes of action under the Martin Act." <u>Kassover</u>, 2008 WL 5331812, at *7 (internal citations omitted) (emphasis added). Numerous courts in this circuit, representing an overwhelming majority, have held that common law claims for negligent misrepresentation, breach of fiduciary duty, and aiding and abetting a breach of fiduciary duty are preempted by the Martin Act.[22]   Appellate Courts in New York state have also dismissed claims styled as common law fraud.  See <u>Whitehall Tenants Corp. v. Olnick</u>, 623 N.Y.S.2d 585, 585 (1st Dep't 1995); <u>Thompson v. Parkchester Apartments Co.</u>, 670 N.Y.S.2d 858, 858 -859 (1st Dep't 1998).

## D.   **Each of the state law claims is subject to dismissal for failure to state a claim**

### 1.   **Common law fraud**

"The elements of common law fraud under New York law are 'essentially the same' as those required to state a claim under Section 10(b) and 10b-5." <u>Cyber Media Group, Inc. v. Island Mortgage Network, Inc.</u>, 183 F. Supp. 2d 559, 580 (E.D.N.Y. 2002).  Common law fraud must be pleaded with particularity under Rule 9(b).  <u>Marcus v. Frome</u>, 275 F. Supp. 2d 496, 503

---

[22] <u>See, e.g.</u>, <u>Castellano v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 190 (2d Cir. 2001) (breach of fiduciary duty); <u>Jana Master Fund, Ltd. v. JPMorgan Chase & Co.</u>, 2008 WL 746540, at *5 (Sup. Ct., N.Y. Cty. Mar. 12, 2008) (aiding and abetting a breach of fiduciary duty and negligent misrepresentation); <u>Kassover</u>, 2008 WL 5331812, at *8) (aiding and abetting breach of fiduciary duty and negligent misrepresentation); <u>In re Bayou Hedge Fund Litig.</u>, 534 F. Supp. 2d at 422) (breach of fiduciary duty); <u>Berk v. Moore, Clayton & Co.</u>, 2006 WL 3616961, at *6 (S.D.N.Y. Dec. 11, 2006) (negligent misrepresentation); <u>In re Marsh & McLennan Co., Inc. Sec. Litig.</u>, 501 F.Supp.2d 452, 495 (S.D.N.Y. 2006) (negligent misrepresentation); <u>Dover Ltd. v. A.B. Watley, Inc.</u>, 423 F. Supp. 2d 303, 330 (S.D.N.Y. 2006) (negligent misrepresentation); <u>Pro Bono Invs., Inc. v. Gerry</u>, 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005) (breach of fiduciary duty and negligent misrepresentation); <u>AIG Global Sec. Lending Corp. v. Banc of America Sec., LLC</u>, 2005 WL 2385854, at *16 (S.D.N.Y. Sept. 26, 2005) (negligent misrepresentation); <u>Sedona Corp. v. Ladenburg Thalmann & Co. Inc.</u>, 2005 WL 1902780, at *23 (S.D.N.Y. Aug. 9, 2005) (negligent misrepresentation and breach of fiduciary duty); <u>Dujardin v. Liberty Media Corp.</u>, 359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005) (negligent misrepresentation and breach of fiduciary duty); <u>Marcus v. Frome</u>, 329 F. Supp. 2d 464, 476 (S.D.N.Y. 2004) (negligent misrepresentation); <u>Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC</u>, 2003 WL 22052894, at *2 (S.D.N.Y. Sept. 2, 2003) (breach of fiduciary duty).

(S.D.N.Y. 2003).  Accordingly, for the reasons set forth above requiring dismissal of the Section 10(b) claim, the common law fraud claim also must be dismissed.  See supra at 6-18.[23]

### 2.   Aiding and abetting breach of fiduciary duty

Plaintiffs also fail to plead a claim for aiding and abetting a breach of fiduciary duty. Under New York law, "[a] claim for aiding and abetting a breach of fiduciary duty requires . . . that the defendant knowingly induced or participated in the breach." Kaufman v. Cohen, 307 A.D.2d 113, 125 (1st Dep't 2003).  The knowledge element of an aiding and abetting claim requires "actual knowledge of the breach of duty." Id.  "Constructive knowledge … is legally insufficient." Id.; see also AHA Sales, Inc. v. Creative Bath Products, Inc., 867 N.Y.S.2d 169, 182 (2nd Dep't 2008).  Here, the Complaint does not allege that KPMG LLP knew of a breach of duty by the Tremont Defendants.

Also, Plaintiffs have not alleged that KPMG LLP "participated in the breach."  New York law is clear that "participation in the breach of fiduciary duty" does not mean "mere inaction." Id. at 170; see Global Minerals and Metals Corp. v. Holme, 824 N.Y.S.2d 210, 217 (1st Dep't 2006).  Here, all that Plaintiffs allege is that KPMG LLP "ignored information that indicated or should have indicated" that Plaintiffs' money was invested with Madoff in a Ponzi scheme. (Cmpl. ¶ 239.)  These are allegations of inaction, not affirmative actions.

### 3.   Breach of fiduciary duty

The claim for breach of fiduciary duty is deficient on its face.  Absent special circumstances, none of which are alleged, accountants are not fiduciaries to their clients or third parties.  See Friedman v. Anderson, 803 N.Y.S.2d 514, 516 (1st Dep't 2005).[24]  Indeed, the

---

[23] Courts regularly dismiss common law fraud claims that accompany defective Section 10(b) claims.  See, e.g., Muller-Paisnar v. TIAA, 2008 WL 3842899, at *1 (2d Cir. Aug. 15, 2008) (dismissing Section 10(b) and common law fraud claims and noting that "[t]he elements of claims for federal securities fraud and New York common law fraud are similar"); Morse v. Weingarten, 777 F. Supp. 312, 319 (S.D.N.Y. 1991) (dismissing fraud claims after addressing § 10(b) claims because the elements of the common law fraud claim are "substantially identical").

[24] See also In re Warnaco Group, Inc. Sec. Litig., 388 F. Supp. 2d 307, 318 (S.D.N.Y. 2005); VTech Holdings Ltd. v. PricewaterhouseCoopers LLP, 348 F. Supp. 2d 255, 268 (S.D.N.Y. 2004); BHC Interim Funding, 283 F. Supp. 2d 968, 987 (S.D.N.Y. 2003); Greenblatt v. Richard Potasky Jewelers, 1994 WL 9754, at *4 (S.D.N.Y. Jan. 13, 1994); Tal v. Superior Vending, LLC, 20 A.D.3d 520, 521 (2d Dep't 2005); DG Liquidation, Inc. v. Anchin, Block & Anchin, LLP, 300 A.D.2d 70, 70-71 (1st Dep't 2002); Hamer v. Chessman, 129 A.D.2d 491, 492 (1st Dep't 1987).

independence required of an auditor "is fundamentally inconsistent with status as a fiduciary." Dan L. Goldwasser et al., Accountants' Liability § 7:1.3 (PLI 2008). Consequently, Plaintiffs cannot maintain a breach of fiduciary duty claim against KPMG LLP.

### 4. Negligent misrepresentation

Plaintiffs also have failed to state a claim for negligent misrepresentation. Plaintiffs have not, as set forth above, alleged a breach of fiduciary duty. Also, there is no allegation that Plaintiffs were in privity or near privity with KPMG LLP. See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 584 n. 16 (2d Cir. 2005) (noting that fiduciary duty, privity, or near-privity are the bases for a negligent misrepresentation claim under New York law). And, for the reasons stated above, Plaintiffs have not adequately alleged reliance on any misstatement made by KPMG LLP. BHC Interim Funding, 283 F. Supp. 2d at 991 (reliance is an element of a negligent misrepresentation claim). Therefore, under the case law and Rule 9(b), Plaintiffs have failed to allege any basis for a negligent misrepresentation claim.

## POINT III

## PLAINTIFFS' CLAIMS ARE SUBJECT TO MANDATORY ARBITRATION AND SHOULD BE STAYED IF THEY ARE NOT DISMISSED

KPMG LLP's audits of the Rye Funds were conducted pursuant to contracts that provide that any dispute arising out of or relating to the audit engagement or any service provided by KPMG LLP "shall" be subject to the dispute resolution procedures set forth in the agreement— mediation and mandatory arbitration—which are the "sole methodologies" for resolving any such dispute. (Worcester Decl. Ex. 19 at 5.) A claim by the Rye Funds against KPMG LLP would be subject to these mandatory arbitration provisions, as would a claim asserted derivatively by a plaintiff purporting to act on behalf of the Rye Funds.[25] See, e.g., In re Salomon Inc. S'holders' Derivative Litig., 1994 WL 533595, at *6 (S.D.N.Y. Sept. 30, 1994) (derivative plaintiffs stand in the shoes of, and are bound by agreements of, the company).

---

[25] KPMG LLP may move to dismiss and to stay the action in favor of arbitration without waiving its arbitration rights. KPMG LLP asserts, and does not waive, its arbitration rights. See Rush v. Oppenheimer & Co., 779 F.2d 885, 888 (2d Cir. 1985); Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc., 754 F.2d 457, 463 (2d Cir. 1985).

Here, to the extent that Plaintiffs seek to assert claims that are derivative in nature, make Plaintiffs third-party beneficiaries to the engagement agreement,[26] or are otherwise subject to the arbitration agreement,[27] KPMG LLP asserts its rights to require that those claims adjudicated not in court, but pursuant to the mandatory mediation and arbitration procedures of the engagement agreement.   Under the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq., which the parties to the engagement agreement agreed would govern (Worcester Decl. Exs. 19-22), the Court must enforce the arbitration agreement.   See, e.g., Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed").   Indeed, under the terms of the engagement agreement, even the question of which claims are arbitrable is a question for the arbitrators to decide.   (See Worcester Decl. Ex. 19, at Appendix II.)   Therefore, if it does not dismiss them, the Court should stay the claims against KPMG LLP.

---

[26] A claim asserted by a third party beneficiary of the audit engagement would be subject to these provisions.   See Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 350, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."); see also Spear, Leeds & Kellogg v. Central Life Assur. Co., 85 F.3d 21, 26 (2d Cir. 1996).

[27] Plaintiffs' claims challenge the sufficiency of the audit services KPMG LLP provided to the Rye Funds pursuant to the engagement agreement, and thus constitute claims "arising out of or related to" the engagement letter as well as claims relating to "services" provided by KPMG LLP.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons advanced by the other defendants to the extent that they apply to KPMG LLP, KPMG LLP respectfully requests that the Court dismiss the claims asserted against it with prejudice, or, alternatively, stay them pending arbitration.

Dated: May 20, 2009

Respectfully submitted,

Gary F. Bendinger
(bendingerg@howrey.com)
Gregory G. Ballard
(ballardg@howrey.com)
Corey Worcester
(worcesterc@howrey.com)
HOWREY LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, NY 10022
Telephone:  (212) 896-6500
Facsimile:  (212) 896-6501

John K. Villa (<u>pro hac vice</u>)
(jvilla@wc.com)
David A. Forkner (<u>pro hac vice</u>)
(dforkner@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

**Attorneys for defendant KPMG LLP**